| | | |
|---|---|---|
| OTIS WORLEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 14-CV-2688 |
| v. | ) | |
| | ) | Judge John W. Darrah |
| MICHAEL MAGANAW, Warden, | ) | |
| Stateville Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Otis Worley has filed a Petition for Writ of *Habeas Corpus*, pursuant to

28 U.S.C. § 2254.  For the reasons provided below, his Petition [1, 4] is denied.  The

Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

## BACKGROUND

### *Factual Background*

When considering a petition made pursuant to § 2254, the factual determinations

of the state court are presumed correct.  *Ford v. Wilson*, 747 F.3d 944, 947 (7th Cir.

2014) (citing 28 U.S.C. § 2254(e)(1)).  Worley has made no attempt to rebut the

following findings of the Illinois Appellate Court:

> At trial in 2008, Helen H. testified that on September 22, 1996, she was a
> 17-year-old high school student living with her mother Patricia H.  At
> about 7:30 a.m. that day, Helen was waiting for a bus at a stop on the same
> block as her home.  She saw an unfamiliar man walking towards her but
> was unconcerned.  The man then grabbed Helen in a headlock.  Helen
> initially believed it was an acquaintance grabbing her as a prank, so she
> insisted he release her as she was on her way to work.  However, the man
> produced a long kitchen knife and told Helen that he would cut her face if
> she did not stay quiet.  The man forced Helen into an empty second-floor

apartment in a nearby abandoned building.  The man braced the apartment door with a wooden board and, as he was still holding the knife, told Helen to take her clothes off.  When she did so, he sexually assaulted her twice.  Afterwards he demanded her money and she handed him $50 cash and a transit pass.  The man tried unsuccessfully to snap Helen's neck by twisting her head.  When he tried to stab her in the stomach, she grabbed the knife by the blade and broke it.  Helen struggled with the man, and when he went for the board at the door, Helen fled for a window.  The man pushed her through the glass window

After Helen fell to the ground, she ran to her home nearby.  Her mother called the police and Helen was brought to the hospital, where she received stitches on her hand from grabbing the knife and on her back, legs, and head from the window glass.  She did not break any bones.  As Dr. Scott Plantz was treating Helen, she told him that she had been attacked, forced into a building, and sexually assaulted.  She also told Dr. Plantz that she did not have sexual intercourse in the 72 hours before the assault.  Swabs were taken from Helen's mouth and vagina.  Helen went to the police station that evening and viewed a lineup but could not identify anyone in it, nor did she identify anyone in subsequent photographic arrays over the next year.  However, she identified [petitioner] as her attacker from a photographic array in October 2007.  When asked to identify [Worley] in court, she was uncertain that [Worley] was her attacker, but she emphasized her confidence in the photo-array identification.

Helen denied knowing or dating [Worley].   She also denied that she attended church or social functions at a church in 1996, although she joined a particular neighborhood church in 1999.   From that church, she knew pastor Willie Douglas as well as church musician Jason Douglas.   She denied recalling that [Worley] or Ronald Dillard had come to her within a week of the assault to offer their assistance in finding the assailant.

Patricia H., Helen's mother, testified that Helen returned home about 15 minutes after leaving for work on the morning in question.   She was bleeding and half-naked, and she seemed upset.   After Helen spoke with her, Patricia called the police.   Later, Patricia accompanied Helen to the hospital.  Patricia denied that she or Helen were [sic] attending church in 1996.

Police detective John Clafford testified that he and another detective went to the hospital to interview Helen.  She had multiple lacerations, and she described her assailant as a black male, 20 to 30 years' old, under six feet tall, and weighing about 160 or 170 pounds.  Detective Clafford then went to the abandoned apartment building indicated by

Helen, where he found a broken knife and some clothing. The apartment door frame and a wooden board near the door were tested for fingerprints but no useable prints were found. Three men found in another apartment in the building were brought to the police station and placed in a lineup, but Helen did not identify anyone in the lineup. She also did not identify anyone in subsequent lineups. The knife and clothing from the scene were destroyed three years after the incident in erroneous belief that they were evidence in a misdemeanor case. To the best of Detective Clafford's knowledge, the knife and clothing were not forensically tested before their destruction.

Detective Jose Alanis testified that he investigated this case from 2006 onward, including taking a cheek swab from [petitioner]. In October 2007, he showed Helen a photographic array, from which she identified [Worley] as her assailant. The photograph of [Worley] that Detective Alanis used in the array was from 1996.

The parties stipulated that Dr. Scott Plantz took swabs from Helen on the day of the incident, a proper chain of custody was maintained for the swabs, semen was found on the swabs, and a male DNA profile extracted from the swabs. The parties further stipulated that, when compared in 2006, [Worley's] DNA profile from his cheek swab matched the DNA profile from Helen's swabs.

The [trial] court denied [Worley's] motion for a directed finding.

[Worley] testified that, in September 1996, he had known Helen for several months. They both attended the same church in their neighborhood, and he and Helen formed a relationship. He had sex with her "off and on" at that time.

[Worley] did not see Helen on the day in question, but a day or two later he was selling drugs on the street near her home, as he did customarily, when he stopped because television news crews came to Helen's home regarding the incident.

[Worley] and his nephew Ronald Dillard then went to Helen; Helen told [Worley] that she would not have been attacked had he been present, and he assured her that they were looking for the assailant. However, they could not find the attacker.

Ronald Dillard, [Worley's] nephew, testified that he and [Worley] sold drugs in the neighborhood in question in 1996 and that he saw [Worley] dating Helen then. After the incident in question, Helen told [Worley] in

Dillard's presence that she would not have been attacked had he been in the area that day.

[Worley] and Dillard told her that they were trying to find the assailant. Dillard admitted to convictions by guilty plea for possession of a controlled substance in 2007 and attempted robbery in 2006, as well as convictions in 2000 and 1999 for possession of a controlled substance. He also admitted that he regularly used as well as sold drugs in 1996.

Sonya Simpson, [Worley's] sister, testified that she saw [Worley] and Helen dating in the fall of 1996.

Felicia Black testified that [Worley] was the father of her son but she had no contact with him for two years before the trial. She knew [Worley] and Helen in the fall of 1996, and she saw Helen and [Worley] exiting Simpson's home together. Black knew that she saw Helen with [Worley] in 1996 rather than some later year because she (Black) was pregnant at the time and the child was born in August 1996. Black admitted to a 1999 conviction for a firearms offense.

Jason Douglas testified for [Worley] that he lived in the neighborhood where the incident occurred and attended the aforementioned church since well before 1996. He knew [Worley] and Helen, both of whom attended the church in 1996. On cross-examination, Douglas admitted to being a friend of [Worley] and that he was uncertain as to when Helen joined the church. He never saw [Worley] and Helen together nor had he ever heard that they had a relationship. On redirect, he explained that he presumed Helen was a member of the church at the time of the assault in 1996 because a youth pastor of the church prayed for her, and may have visited her, following the assault.

Following closing arguments, the court found [Worley] guilty of aggravated criminal sexual assault, expressly finding that Helen's testimony was credible.

Rule 23 Order, *People v. Worley*, No. 1-08-2348 (Ill. App. Ct. Apr. 26, 2010); (Respondent's Answer, Ex. A).

## Procedural Background

In his appeal to the Illinois Appellate Court, Worley argued exclusively that the state failed to prove him guilty beyond a reasonable doubt because "[Helen] testified that

her assailant was previously unknown to her, but where Worley presented overwhelming evidence that he had an intimate relationship with [Helen] prior to the attack." *People v. Worley*, No. 1-08-2348 (Ill. App. Ct. Apr. 26, 2010); (Respondent's Answer, Exs. A, B, C, D). The Illinois Appellate Court affirmed his conviction.

Worley's subsequent petition for leave to appeal ("PLA") again argued only that the state had presented insufficient evidence. *People v. Worley*, No. 110454 (Ill.); (Respondent's Answer, Ex. E, F). On September 29, 2010, the Illinois Supreme Court denied Worley's PLA. *Id*. The United States Supreme Court denied Worley's petition for writ of *certiorari* on February 22, 2011. *Worley v. Illinois*, 131 S.Ct. 1510 (2011).

On June 21, 2011, Worley, proceeding *pro se*, filed a petition for postconviction relief, pursuant to 725 Ill. Comp. Stat 5/122-1, *et seq*., in the Circuit Court of Cook County. *People v. Worley*, No. 06 CR 15585 (Cir. Ct. Cook Cnty.); (Respondent's Answer, Ex. M). In his postconviction petition, Worley argued:

1. The state presented perjured testimony;

2. Trial counsel was ineffective for failing to:

    a. properly investigate the case;

    b. properly argue pretrial motions;

    c. explain to Worley the consequences of a stipulation agreement;

    d. make timely objections; and

    e. expose perjury and preserve issues for appellate review;

3. Actual Innocence;

4. The state withheld favorable evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963);

5. Violations of due process related to the Victim's identification:

   a. The photo array used to identify Worley was suggestive;

   b. No lineup was undertaken despite Worley being in custody;

   c. Worley was not afforded counsel during the Victim's identification;

6. The indictment was invalid due to destruction of evidence;

7. The trial court misstated the law and displayed bias in denying Worley's motion to dismiss the indictment;

8. Appellate counsel was ineffective for failing to raise the following claims on appeal:

   a. Additional evidence was destroyed;

   b. Ineffective assistance of trial counsel;

   c. Prosecutorial misconduct, specifically withholding evidence;

   d. The state's use of perjured testimony;

   e. The trial judge displayed bias and abused his discretion;

   f. The photo array was suggestive;

   g. The trial court erred in denying a motion for directed verdict;

   h. The trial court erred in denying a motion for new trial;

9. The prosecutor was allowed to vouch for the credibility of a witness; and

      10.      Worley's due process rights were violated because the statute of

             limitations had run.

*Id*. On September 20, 2011, the circuit court dismissed Worley's postconviction petition

as frivolous and patently without merit. *Id*.

Worley appealed the dismissal of his postconviction petition but raised only one

issue: that Worley's appellate counsel was ineffective for failing to raise the issue that

comments made by the trial court judge demonstrated bias. *People v. Worley*, No. 1-12-

0281 (Ill. App. Ct.); (Respondent's Answer, Exs. H, I, J). On June 25, 2013, the Illinois

Appellate Court affirmed the dismissal. *People v. Worley*, No. 1-12-0281 (Ill. App. Ct.

June 25, 2013); (Respondent's Answer, Ex. G). Worley filed a PLA asserting the same

argument that his appellate counsel was ineffective for failing to argue judicial bias, and

on March 26, 2014, the Illinois Supreme Court denied that PLA. *People v. Worley*, No.

117246 (Ill. 2014); (Respondent's Answer, Ex. L).

Worley's instant Petition for Writ of *Habeas Corpus* alleges six grounds for

relief:

A. Destruction of evidence;

B. Ineffective assistance of appellate counsel for failure to raise the issue of

    destruction of evidence;

C. The photo array used to identify Worley was suggestive;

D. Actual Innocence;

E. The state presented perjured testimony; and

F. The statute of limitations had run.

(Dkt. No. 1.)  Neither party disputes that Worley has exhausted his state court remedies, the petition is timely, and none of the claims is precluded by the doctrine of nonretroactivity.

## LEGAL STANDARD

A state court's decision does not provide grounds for *habeas corpus* relief from the federal court unless that decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Relief from a state court decision under the "contrary to" clause is available in two ways:  when the decision runs counter to the decisions of the United States Supreme Court on a question of law, or when the state court rules differently than the United States Supreme Court on a set of "materially indistinguishable" facts.  *Williams v. Taylor,* 529 U.S. 362, 405 (2000).

The "unreasonable application" clause also is considered in one of two ways. The first arises when the state court correctly identifies the controlling legal principle, but applies it to the case unreasonably.  *Id*. at 407.  The second involves the state court "unreasonably extends a legal principle . . . to a new context where it should not apply" or "unreasonably refuses to extend that principle to a new context where it should apply." *Id.*  This standard does not demand merely that application be incorrect, but "objectively unreasonable."  *Id*.  A law's application need only be "minimally consistent with the facts

and circumstances of the case." *Hall v. Zenk*, 692 F.3d 793, 798 (7th Cir. 2012) (internal quotation marks and citation omitted).

Because state-court rulings are reviewed in such a deferential light, the burden of proof rests with the petitioner. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). To overcome the presumption of correctness afforded state-court decisions, the petitioner must provide "clear and convincing evidence." *Woolley v. Rednour*, 702 F.3d 411, 426-27 (7th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)).

A person in custody pursuant to state-court action may not petition for a writ of *habeas corpus* until he has exhausted all remedies available to him in state court. 28 U.S.C. § 2254(b)(1)(A). The petitioner is required to assert his claim at every level in the state-court system, "including levels at which review is discretionary rather than mandatory." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Otherwise, the claim is procedurally defaulted. *Id.* "In Illinois, this means that a petitioner must have directly appealed to the Illinois Appellate Court and presented the claim in a petition for leave to appeal to the Illinois Supreme Court." *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *O'Sullivan*, 526 U.S. at 848)).

## ANALYSIS

### *Procedural Default*

"[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan*, 526 U.S. at 845. As set out above, Worley's direct

appeal presented only one claim at every level: that the state had presented insufficient evidence to sustain his conviction. In his collateral petition for postconviction relief, Worley alleged numerous grounds before the circuit court. However, after that petition was dismissed, Worley asserted to the Illinois Appellate Court and Illinois Supreme Court only the claim that his counsel was ineffective for failing to argue judicial bias.

Only two of Worley's claims raised here even potentially satisfy the exhaustion doctrine requirement. Worley brought his direct appeal claim of insufficient evidence at every level of the state-court system, but he has not made an insufficient evidence claim in the instant petition. Worley also brought an ineffective assistance of counsel claim at every level of his postconviction proceedings, but he failed to "identify the *specific acts or omissions* of counsel that form the basis for his claim of ineffective assistance," as required. *Momient-El v. DeTella*, 118 F.3d 535, 541 (7th Cir. 1997) (citing *Dugan v. United States*, 18 F.3d 460, 464 (7th Cir. 1994)) (emphasis added). None of the eight grounds of ineffective assistance of counsel claims presented to the circuit court was submitted to the Illinois Appellate or Supreme Courts. Conversely, the specific act of failing to argue judicial bias – raised in the Appellate and Supreme Courts – was not raised at the circuit court level. Therefore, all six of Worley's claims in the instant Petition are procedurally defaulted.

An otherwise defaulted claim can be saved by showing either (1) cause for the default and prejudice or (2) that ignoring the default is necessary to prevent a fundamental miscarriage of justice. *Id.*

The first exception requires the petitioner to identify "some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (quotation marks and citation omitted). The petitioner must also show that prejudice "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Worley does not specifically allege that he was somehow prevented from bringing any of his six claims in the instant petition to every level of the state-court proceedings. Claim B alleges ineffective assistance of appellate counsel for failing to assert that the state destroyed evidence, and ineffective assistance of counsel can be cause for default. *McCleskey*, 499 U.S. at 494. "However, a claim of ineffectiveness must itself have been fairly presented to the state courts before it can establish cause for a procedural default of another claim." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004) (citing *Edwards v. Carpenter*, 529 U.S. 446, 452-54 (2000)). Because Worley failed to assert his ineffective assistance of counsel claim – specifically with regard to alleged destruction of evidence – in the Illinois Appellate and Supreme Courts, it cannot suffice as cause for his default.

The second exception, miscarriage of justice, arises only in cases of "actual innocence," in which a petitioner is required to show that "more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 513, 538 (2006). Any such claim of actual innocence must be supported by new evidence of innocence. *Shlup v. Delo*, 513 U.S. 298, 316 (1995) ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient

to establish a miscarriage of justice that would allow a *habeas* court to reach the merits of a barred claim").

Worley appended three documents to the Petition in support of his claim of actual innocence. The first was an Illinois State Police forensic report, detailing the results of the victim's vaginal swab and that the victim's fingernail scrapings were not examined. (Dkt. No. 4, Ex. 4.) Yet, the record is clear that Worley stipulated to the testimony of the scientist who performed the tests. Therefore, the information in the report was apparently available at trial and Worley has not shown this was new evidence.

The other two documents contain new information, in that they were not presented at trial. *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003). One document is the affidavit of Ustashi Robertson, swearing in relevant part: (1) that he regularly saw Worley and the victim speaking; (2) that he never witnessed Worley and the victim having sexual intercourse; (3) that he had personal knowledge Worley and the victim were friends; (4) that Worley could not have assaulted the victim "because we all ([Worley], Ronald Dillard and myself) tried to assist her." (Dkt. No. 4, Ex. 4.) As set out above, all of the information in the affidavit was offered by witnesses who did testify at trial. Therefore, the affidavit falls short of evidence that would make it more likely than not a reasonable juror would have reasonable doubt. *Gomez*, 350 F.3d at 680.

The final document is a police report, indicating that two high school identification cards reported missing by the victim after her attack were found by a mail carrier where the victim was assaulted. (Dkt. No. 4, Ex. 4.) It is not clear why Worley believes this report demonstrates actual innocence, but his own handwriting on the report

reads "What happened to blood or fingerprints not mine." To the extent that Worley intended to argue that testing the identification cards for blood or fingerprints would have revealed another party, this is far too speculative to support a claim of actual innocence. Worley has not submitted evidence that there were other fingerprints or blood associated with the assault, only that the identification cards *could have been* tested. Submitting this theory to the trial judge would not have made it impossible to convict.

Submitting all three documents to the trial judge would not absolutely preclude a conviction. The state presented the victim's testimony that she was attacked at knifepoint, forced into an abandoned apartment, and sexually assaulted. A detective then testified to finding the apartment substantially as the victim described it. The victim identified Worley as her attacker in a photo array. And the state presented the results of the victim's vaginal swab, showing DNA matching Worley's. The trial judge acknowledged Worley's contention that he had a consensual relationship with the victim but specifically credited the victim's testimony. (Respondent's Answer, Ex. C at 11 ("I absolutely believe the testimony of the victim . . . in this case.").) Accordingly, Worley has not established a fundamental miscarriage of justice.

*Certificate of Appealability*

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requires that the petitioner show that "reasonable jurists" could resolve the issues differently and that the petitioner's argument "deserve[s] encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

Denying the certificate of appealability on procedural grounds is proper only when a "plain procedural bar" exists on which reasonable jurists could not disagree. *Id.* However, where a plain procedural bar is present and a district court correctly invokes a bar to dispose of those claims, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. *Id.* Worley has failed to make a substantial showing of the denial of a constitutional right in the instant Petition. Accordingly, a certificate of appealability shall not issue.

## CONCLUSION

For the reasons stated above, Worley's Petition for Writ of *Habeas Corpus* pursuant to 28 U.S.C. § 2254 [1, 4] is denied. A certificate of appealability is not issued.

Date:    12/2/2014    

                                                _____
                                                JOHN W. DARRAH
                                                United States District Court Judge